IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| VOLO SPORTSPLEX, INC., AND A CHILD'S PLACE DAY CARE INC., <br><br>Plaintiffs, <br>v. <br><br>BEE-LINE COMMUNICATIONS, INC., AND STACEY MCCLENATHAN, AN INDIVIDUAL, <br><br>Defendants. | Trial by Jury Demanded <br><br>Case No. |

COMPLAINT

PlaintiffsVolo Sportsplex, Inc., and A Child's Place Day Care Inc. ("Plaintiffs"), herebybring the present action against Bee-Line Communications, Inc. and Stacey McClenathan (collectively "Defendants") and allege as follows:

The Parties

1. Plaintiff Volo Sportsplex, Inc. ("Volo Sportsplex") is an Illinois Corporation with its principal place of business located in Volo, Illinois, which is located within the boundaries of The Northern District of Illinois.

2. Plaintiff A Child's Place Day Care, Inc. ("A Child's Place") is an Illinois Corporation with locations in Antioch, McHenry and Volo, both of which are located in the Northern District of Illinois.

3. Plaintiffs Volo Sportsplex and A Child's Place share common owners.

4. Defendant Bee-Line Communications, Inc. ("Bee-Line") is, upon information and belief, an Illinois Corporation having its principal place of business in Libertyville, Illinois, which is located within the boundaries of the Northern District of Illinois.

1

5. Defendant Stacey McClenathan ("McClenathan") is, upon information and belief, a citizen and resident of the State of Wisconsin residing in Delevan, Wisconsin. Upon information and belief, McClenathan is the owner and operator of Bee-Line.

## Jurisdiction and Venue

6. This Court has original subject matter jurisdiction over Bee-Line and McClenathan pursuant to the provisions of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.* This Court has jurisdiction over the claims in this action that arise under the laws of the State of Illinois pursuant to 28 U.S.C. § 1367(a), because the state law claims are so related to the federal claims that they form part of the same case or controversy and derive from a common nucleus of operative facts.

7. This Court has personal jurisdiction over Defendants since Defendants, and each of them, reside in, conduct business in, and / or have committed tortuous acts while physically present within the State of Illinois.

8. Venue is proper in this judicial district pursuant to 28 U.S.C. 1391(b) and (c). All Defendants and Plaintiffs reside in this judicial district and / or a substantial part of the events giving rise to Plaintiffs' claims occurred in this judicial district.

## Factual Allegations

9. Volo Sportsplex is a sports facility located in Volo, Illinois, and provides excellent quality general fitness and sports services to persons of all ages in a top-notch facility.

10. A Child's Place is a provider of excellent quality day care services for children from infants through school age with locations in Antioch, Illinois, McHenry, Illinois, Volo, Illinois and Ingleside, Illinois.

11. On information and belief, Bee-Line is a software contractor that purports to provide "strategy, creative, and digital" services. In particular, and relevant to this matter, Bee-Line claims that it possesses skill and expertise in designing, programming, and implementing websites and related software, such as that used to provide services through a website.

2

12. On information and belief, McClenathan purports to be the owner and founder of Bee-Line and acts as Bee-Line's front line salesperson and point of contact.

13. Beginning in or around January 2012, the owners and managers of A Child's Place devised a software system that could be used for daycare operators.

14. Sometime in late 2013, the owners and managers of A Child's Place approached Bee-Line and McClenathan regarding designing, programming, and implementing A Child's Place's software system.

15. In January of 2014, Bee-Line issued a Statement of Work ("SOW") that promised delivery of functional software within a period of eight to twelve (8-12) weeks.

16. A Child's Place then entered into an Agreement with Bee-Line to build the software system.

17. As part of this Agreement, Bee-Line agreed in writing to <u>never</u> charge for software bug fixes of any kind.

18. As part of this Agreement, Bee-Line agreed in writing to waive any fees for website design and branding.

19. On information and belief, as of January 2014, Bee-Line began work on the software system.

20. In or about February 2014, Bee-Line delivered wireframes for A Child's Place to review.

21. A Child's Place reviewed and approved the wireframes.

22. On information and belief, between February and April of 2014 Bee-Line attempted to implement the software system.

23. During this time, Bee-Line claimed multiple times that the software was "almost ready," and "nearly complete." However, the software system was never built to specification.

24. In addition, errors in the system required A Child's Place to devote a great deal of time and effort to review the system and attempting to make sure that the software system functioned as promised, which it never did.

25. In May of 2014, approximately twenty weeks after Bee-Line was contracted to complete the software (which it promised to do in 8-12 weeks), Bee-Line finally created a test account for A Child's Place, which would be the first step in delivering a functional software system.

26. In May of 2014, the software system was not even close to delivering the promised functionality. Numerous particular issues were noted including the following:

   a. Instead of using custom built software for all functions that A Child's Place would own all rights to, Bee-Line made extensive use of "open source" code.

   b. The invoicing system was not built to specification.

   c. The credit card billing system was not built to specification.

   d. The "easy button reports" (a collection of canned reports commonly used by daycare operators) were mostly not functional.

27. When confronted with these issues, McClenathan became defensive, and stated that while the software system was not built to specification, it would be made to specification shortly.

28. Bee-Line then agreed that all work toward the initial specifications would be completed shortly after Labor Day (September) of 2014.

29. In August of 2014, Bee-Line promised that the software system would be ready shortly, and it could launch "any day."

30. In September of 2014, after being assured by Bee-Line that the software system was 100% functional and to specification, A Child's Place agreed to roll it out at all of A Child's Place Day Care centers.

31. As the rollout progressed, numerous bugs and issues were uncovered. Accordingly, to prevent a loss of service for its customers, A Child's Place continued to mirror its old system. This required A Child's Place to add additional part-time staff to perform data entry and software oversight.

32. A sample of some of the problems that the software had as of September 2014 – December 2014 are as follows:

   a. Auto-billing was not functional.

   b. Payments with errors could not be backed out.

   c. Parents could not log-in.

   d. Data corruption occurred regularly.

   e. The system did not work with Internet Explorer 8.

33. During this period, Bee-Line issued invoices with no specificity, and which did not match the promised quotation.

34. Between January 2015 and March 2015, many additional issues arose. Some of these issues were as follows:

   a. Despite claiming it was fixed, auto-billing still did not work properly.

   b. Clients of A Child's Place were routinely double billed by the system.

   c. The system became unacceptably slow as more data was added to it.

35. Since the time the software system had launched until March 2015, A Child's Place received hundreds of complaints from customers that were directly attributable to the software system.

36. As a result of various issues with software system, A Child's Place has lost customers due to incidents related to billing errors.

37. Bee-Line then indicated that all problems would be addressed and completed in "Phase 2" of the software system development.

38. Bee-Line presented a new proposal calling for more money to implement "Phase 2" and to address the majority of the outstanding issues with the software system.

39. On information and belief, between May 2015 and August 2015 "Phase 2" was developed by Bee-Line.

40. During the development of Phase 2, hundreds of additional complaints came from parents, A Child's Place continued to use two different software systems because of reliability concerns with the software system, and A Child's Place was forced to hire <u>full time</u> staff to oversee the software.

41. In August of 2015, Phase 2 was launched. However, the launch had additional issues.

   a. Bee-Line's data migration tool erased much of the granularity of the data, and lumped all of a customer's payment history into a single "account" number.

   b. The ability to change the date of a payment ceased working.

   c. Reporting functions still did not work properly.

42. Between September of 2015 and December of 2015, issues continued with the software system.

43. The issues with the software system during this time consumed all of one staff member's time. These issues included:

   a. Auto-bill pay via credit card actually started to work, but not consistently.

   b. Double billing issues continued.

   c. The software system became slower and slower.

   d. Numerous random invoices of varying amounts would appear.

   e. A Child's Place had to continue using two separate billing systems because of reliability concerns with the software system.

   f. Reporting functionality still didn't work.

   g. Login in errors occurred frequently.

6

    h. Ledger balances frequently reflected erroneous amounts.

44. During the period between September of 2015 and December of 2015, Volo Sportsplex engaged Bee-Line to develop a website and logo, which was delivered in or around December of 2015.

45. In January of 2016, the Volo Sportsplex website started to have issues as well.

46. In particular, customers of Volo Sportsplex complained that they could not find programs to register for, and that the website did not function on certain media devices.

47. During the same period, A Child's Place also had numerous issues. For example, Website photos stopped working properly.

48. In or around January of 2016, given the numerous issues that A Child's Place was having with the software system, A Child's Place requested detailed invoices from Defendants.

49. In or around late March of 2016, Bee-Line provided what it claimed was a "comprehensive" set of invoices. However, these invoices 1) were largely incomprehensible, and 2) did not reflect that any payments had been made.

50. In or around April of 2016, the principals of Volo Sportsplex met with Bee-Line and delivered a check to Bee-Line, and Bee-Line agreed that check reduced the balance for Volo Sportsplex to zero. Since April of 2016, Bee-Line has performed minimal work for Volo Sportsplex.

51. By this time, A Child's Place and Volo Sportsplex had paid no less than $168,000. Bee-Line does not acknowledge these payments.

52. The total quotation from Bee-Line for all projects was approximately $120,000, which is far less than the amount that had already been paid by A Child's Place and Volo Sportsplex.

53. In or around April of 2016, Bee-Line approached A Child's Place with a proposal to market and sell the software system.

54. A Child's Place questioned that the software system was ready to be sold and marketed to any customer.

7

55.     Bee-Line assured A Child's Place that a stable build with all features implemented was days away. Accordingly, A Child's Place agreed to Bee-Line's proposal.

56.     In or around late May of 2016 the principals of A Child's Place met with Bee-Line and McClenathan to go over features of the software system that were still not working and features that did not work properly.

57.     At this meeting, Bee-Line presented A Child's Place with yet another Statement of Work and additional charges to fix the software system.

58.     A Child's Place objected, and Bee-Line indicated that the charges would be revised to only reflect new features.

59.     No updated quotation was ever received from Bee-Line. However, A Child's Place agreed to pay $8,000 per month on the condition that all issues with the software be resolved immediately and quickly.

60.     Between July of 2016 and August of 2016, A Child's Place continued to pay Bee-Line $8,000 per month with the expectation that Bee-Line would quickly resolve the issues with the software system.

61.     In October of 2016, a meeting was held with Bee-Line, which indicated that it was unable to make any more progress in addressing bug fixes because of a supposed payment issue. However, Bee-Line had already agreed in writing to never charge for bug fixes. Bee-Line also disputed that A Child's Place was current on its monthly $8,000 payments.

62.     A Child's Place again requested detailed invoices, and was given invoices for 2016, with a very large carry over amount from 2015. No detail was provided for the carry over amount, which should have been zero based on the parties Agreement and payments made by A Child's Place. In addition, the 2016 invoices lacked any support for the charges that were made.

63. In November of 2016, after numerous requests, Bee-Line provided comprehensive invoices.

64. A Child's Place reviewed these invoices and found numerous improper charges, double charges, and other discrepancies.

65. In November of 2016, A Child's Place made a final payment to Bee-Line. In addition, A Child's Place told Bee-Line that it believed that it had paid for all proper charges, and would not provide additional payments unless and until Bee-Line justified the same.

66. Bee-Line did not respond to A Child's Place numerous requests for a meeting to discuss the invoices.

67. On January 5, 2017 Bee-Line emailed A Child's Place and demanded payment. A Child's Place reiterated that no further payment would be made unless and until Bee-Line met with A Child's Place and justified the disputed charges.

68. Bee-Line responded that it would not meet with A Child's Place unless and until additional payments were made.

69. On January 10, 2017, Bee-Line told A Child's Place that it would shut down the software system as well as the websites for A Child's Place and Volo Sportsplex.

70. A Child's Place responded that it would not make any payments unless and until Bee-Line met with A Child's Place and justified the disputed charges.

71. On information and belief, on January 11, 2017, Bee-Line followed through on its threat, and shut down the software system, as well as vandalizing the websites for A Child's Place and Volo Sportsplex.

72. On information and belief, the Bee-Line employee that authorized or actually vandalized the websites for A Child's Place and Volo Sportsplex was McClenathan.

9

73. On or about January 12, 2017, A Child's Place had to expend substantial time and money to move to a different software system for customer billing and other operations.

74. On or about January 18, 2017, Volo Sportsplex took the necessary steps to partially repair its website.

75. On or about January 18, 2017, A Child's Place took the necessary steps to partially repair its website.

76. Given that Volo Sportsplex had paid Bee-Line's invoices in full, Bee-Line had no authority to vandalize Volo Sportsplex's website.

77. Given that Bee-Line agreed to not charge A Child's Place for website development, Bee-Line had no authority to vandalize A Child's Place's website.

78. Alternatively, given that A Child's Place had paid far more than the amount that Bee-Line quoted to A Child's Place for all work, Bee-Line had no authority to vandalize a Child's Place's website.

79. Given that A Child's Place had paid far more than the quoted price for the development of the software system, Bee-Line had no authority to take the software system off line.

80. Bee-Line had a duty to turn the source code and all related tools and files necessary to utilize the source code for the software system over once the software system was paid for.

81. Given that A Child's Place had paid far more than the quoted price for the development of the software system, Bee-Line had duty a turn the source code and all related tools and files necessary to utilize the source code for the software system over to A Child's Place.

### COUNT ONE

#### Volo Sportsplex's Claim Against All Defendants for
#### Breach of the Computer Fraud and Abuse Act

82. The allegations in paragraphs 1 through 80 are incorporated by reference.

83. As of January 11, 2017, Volo Sportsplex had paid Bee-Line in full for development of its website.

84. As of January 11, 2017, Bee-Line had not done any work for Volo Sportsplex since approximately April of 2016; a period of nine (9) months.

85. On or about January 11, 2017, the computer that held the configuration data for Volo Sportsplex's website was protected from access using reasonable protective measures.

86. On or about January 11, 2017 an employee or operative of Bee-Line accessed the computer system holding the configuration data for Volo Sportsplex's website, and altered data pertinent to the operation of Volo Sportsplex's website.

87. McClenathan was the employee or operative mentioned in the previous paragraph, or instructed and authorized employee or operative mentioned in the previous paragraph to make the alterations to the above referenced computer system.

88. As of January 11, 2017, neither Bee-Line nor McClenathan were authorized to make alterations to Volo Sportsplex's website that would result in any alterations of the appearance or operations of the website.

89. As a result of this alteration Volo Sportsplex was forced to manually repair the damage caused by Bee-Line and McClenathan, and the site is still not fully operational at this time.

90. The total loss to Volo Sportsplex in funds expended to repair Bee-Line and McClenathan's vandalism as well as in lost business while repairs were in process exceeded $5,000.

WHEREFORE, Plaintiff Volo Sportsplex, Inc., prays that this Court enter judgment in favor of Plaintiff and against Defendants Bee-Line Communications, Inc. and Stacey McClenathan, and ordering as follows:

A. Judgment in favor of Plaintiff Volo Sportsplex and against Defendants, where Defendants accessed a computer holding the configuration data of Volo Sportsplex's website, and altered the same without authorization to do so;

B. Compensatory damages together with costs and prejudgment interest;

C. That the Court grant a preliminary and permanent injunction against Defendants prohibiting them from any further acts of vandalism against Volo Sportsplex.

D. Any other relief that the Court deems equitable and necessary to vindicate Volo Sportsplex in this matter.

## COUNT TWO

### A Child's Place Claim Against All Defendants for Breach of the Computer Fraud and Abuse Act

91. The allegations in paragraphs 1 through 80 are incorporated by reference.

92. As of January 11, 2017, pursuant to the Agreement between A Child's Place and Bee-Line, Bee-Line was not to charge A Child's Place for any work on A Child's Place's website; rather, all charges were to strictly be for the software system.

93. On or about January 11, 2017, the computer that held the configuration data for A Child's Place's website was protected from access using reasonable protective measures.

94. On or about January 11, 2017 an employee or operative of Bee-Line accessed the computer system holding the configuration data for A Child's Place's website, and altered data pertinent to the operation of A Child's Place's website.

95. McClenathan was the employee or operative mentioned in the previous paragraph, or instructed and authorized employee or operative mentioned in the previous paragraph to make the alterations to the above referenced computer system.

96. As of January 11, 2017, neither Bee-Line nor McClenathan were authorized to make alterations to A Child's Place's website that would result in any alterations of the appearance or operations of the website.

97. As a result of this alteration A Child's Place was forced to manually repair the damage caused by Bee-Line and McClenathan, and the site is still not fully operational at this time.

98. The total loss to A Child's Place in funds expended to repair Bee-Line and McClenathan's vandalism as well as in lost business while repairs were in process exceeded $5,000.

WHEREFORE, Plaintiff A Child's Place, Inc., prays that this Court enter judgment in favor of Plaintiff and against Defendants Bee-Line Communications, Inc. and Stacey McClenathan, and ordering as follows:

A. Judgment in favor of Plaintiff A Child's Place and against Defendants, where Defendants accessed a computer holding the configuration data of A Child's Place's website, and altered the same without authorization to do so;

B. Compensatory damages together with costs and prejudgment interest;

C. That the Court grant a preliminary and permanent injunction against Defendants prohibiting them from any further acts of vandalism against Volo Sportsplex.

D. Any other relief that the Court deems equitable and necessary to vindicate A Child's Place in this matter.

### COUNT THREE

**A Child's Place Claim for Tortious Interference
with Business Relationships Against All Defendants**

99. The allegations in paragraphs 1 through 80 are incorporated by reference.

100. Through its website, A Child's Place engaged with its customers and prospective customers on a continuous basis.

101. Customers of A Child's Place are able to, for example, pay bills, check their account, and access a calendar of events.

102. On or about January 11, 2017, Bee-Line and / or McClenathan, without authorization, and without good cause, accessed the configuration of A Child's Place website, and vandalized the same.

103. On information and belief, Bee-Line's and / or McClenathan's intention was to disrupt the business relationship between A Child's Place and its customers and prospective customers.

104. A Child's Place has suffered substantial actual damages as a result of Bee-Line's and / or McClenathan's tortious actions.

105. On information and belief, Bee-Line's and / or McClenathan's tortious actions were willful, wanton and knowing, or at a minimum, Bee-Line and / or McClenathan acted with such gross negligence as to indicate a wanton disregard for A Child's Place's rights.

WHEREFORE, Plaintiff A Child's Place, Inc., prays that this Court enter judgment in favor of Plaintiff and against Defendants Bee-Line Communications, Inc. and Stacey McClenathan, and ordering as follows:

A. Judgment in favor of Plaintiff A Child's Place and against Defendants, where Defendants tortuously interfered with A Child's Place relationship with its customers and prospective customers;

B. Compensatory damages together with costs and prejudgment interest;

C. That the Court grant a preliminary and permanent injunction against Defendants prohibiting them from any further acts of vandalism against A Child's Place or actions that would disrupt the business of A Child's Place.

D. Any other relief that the Court deems equitable and necessary to vindicate A Child's Place in this matter.

## COUNT FOUR

### Volo Sportsplex's Claim for Tortious Interference

with Business Relationship Against All Defendant's

106. The allegations in paragraphs 1 through 80 are incorporated by reference.

107. Through its website, Volo Sportsplex engaged with its customers and prospective customers on a continuous basis.

108. Customers of Volo Sportsplex are able to, for example, pay bills, check their account, and access a calendar of events.

109. On or about January 11, 2017, Bee-Line and / or McClenathan, without authorization, and without good cause, accessed the configuration of Volo Sportsplex's website, and vandalized the same.

110. On information and belief, Bee-Line's and / or McClenathan's intention was to disrupt the business relationship between Volo Sportsplex and its customers and prospective customers.

111. Volo Sportsplex has suffered substantial actual damages as a result of Bee-Line's and / or McClenathan's tortious actions.

WHEREFORE, Plaintiff Volo Sportsplex, Inc., prays that this Court enter judgment in favor of Plaintiff Volo Sportsplex, Inc. and against Defendants Bee-Line Communications, Inc. and Stacey McClenathan, and ordering as follows:

    A.    Judgment in favor of Plaintiff Volo Sportsplex and against Defendants, where Defendants tortuously interfered with Volo Sportsplex's relationship with its customers and prospective customers;

    B.    Compensatory damages together with costs and prejudgment interest;

    C.    That the Court grant a preliminary and permanent injunction against Defendants prohibiting them from any further acts of vandalism against Volo Sportsplex.

    D.    Any other relief that the Court deems equitable and necessary to vindicate Volo Sportsplex in this matter.

## COUNT FIVE

### A Child's Place Claim for
### Breach of Contract Against Defendant Bee-Line

112. The allegations in paragraphs 1 through 80 are incorporated by reference.

113. A Child's Place and Bee-Line entered into an enforceable agreement for the development of the software system.

114. A Child's Place fulfilled all obligations per the terms of the Agreement.

115. Despite A Child's Place fulfilling its obligations, Bee-Line 1) did not turn over the software system including the source code, and 2) actually blocked access by A Child's Place to the software system.

116. By failing to turn over the software system including the source code, and blocking A Child's Place access to the software system, Bee-Line breached the terms of the Agreement.

117. As a result of Bee-Line's breach of the Agreement, A Child's Place has suffered more than $250,000 in damages.

WHEREFORE, Plaintiff A Child's Place, Inc., prays that this Court enter judgment in favor of Plaintiff and against Defendant Bee-Line Communications, Inc. and order as follows:

A. Judgment in favor of Plaintiff A Child's Place and against Defendant Bee-Line, where Defendant Bee-Line breached its Agreement with A Child's Place relationship;

B. Compensatory damages in excess of two hundred fifty thousand dollars ($250,000) together with costs and prejudgment interest;

C. That the Court grant a preliminary and permanent injunction requiring Defendants to turn over all source code, passwords, and access to the source code as well as to A Child's Place website.

D. Any other relief that the Court deems equitable and necessary to vindicate A Child's Place in this matter.

**Demand for Jury Trial**

Plaintiffs demand a trial by jury for all issues so triable.

A CHILDS PLACE, INC.
VOLO SPORTSPLEX, INC.

By: /s/ Konrad Sherinian
Konrad Sherinian
One of Plaintiffs' attorneys

<u>Attorneys for Plaintiffs</u>

Konrad Sherinian
Depeng Bi
THE LAW OFFICES OF KONRAD SHERINIAN, LLC
1755 Park Street, Suite #200
Naperville, IL 60563
Phone: (630) 318-2606
Fax: (630) 364-5825
Email: ksherinian@sherinianlaw.net
Email: ebi@sherinianlaw.net